*In re* MARRIAGE OF SANDRA DARLENE HOFMANN, Petitioner-Appellee and Counterappellant, and ROGER WILLIAM HOFMANN, Respondent-Appellant and Counterappellee.—(WILLIAM H. HOFMANN *et al.*, Appellants and Counterappellees.)

Third District   No. 80-468

Opinion filed August 25, 1981.

Peter H. Lousberg, of Klockau, McCarthy, Lousberg, Ellison & Rinden, of Rock Island, for appellant Roger William Hofmann.

Samuel S. McHard, of Katz, McAndrews, Durkee & Telleen, of Rock Island, for appellants William H. and Donna Hofmann.

Franklin S. Wallace, of Winstein, Kavensky, Wallace & Doughty, of Rock Island, for appellee Sandra Darlene Hofmann.

Mr. JUSTICE ALLOY delivered the opinion of the court:

The respondent, Roger Hofmann, appeals from the judgment of the circuit court upon the dissolution of his marriage to petitioner, Sandra Hofmann. He appeals the court's denomination of a 319-acre farm as marital property and its award to the petitioner of 30% of the farm's current market value. Title to the farm is in the respondent's parents, William H. and Donna Hofmann, who were added as defendants in the dissolution action. The court placed a lien upon the property to facilitate the enforcement of Sandra's award. Accordingly, William and Donna Hofmann also appeal. Sandra counterappeals for an increased award of marital property and for attorney's fees.

Roger Hofmann is 33 years old. His occupation is farming. He and Sandra married in 1972. One daughter was born to them in 1975. During the marriage, Roger farmed two parcels of land. The 77½-acre McManus farm was purchased by Roger in 1969 for $650 per acre. His parents gave him the $10,000 down payment toward the $50,375 purchase price. The court found this parcel to be Roger's separate property. It is not a subject of this appeal.

The disputed land is called the "Sackville Farm." It consists of 319 acres. Roger's parents entered into a contract to purchase it for $160,000 in February of 1971, and then entered into possession. The contract was fully paid and the Sackville Farm was deeded to the parents on February 17, 1975. Roger leased the farm from his parents from 1971 to 1975 on a 50% crop-share basis. He and Sandra lived in the farmhouse, but paid no cash rent. In the winter of 1975-76, Roger asked his parents to sell him the Sackville Farm on an installment contract. His parents were at first reluctant to do so, but finally agreed. A contract for deed, dated April 15, 1976, was executed. The purchase price was $750 per acre or $239,250 for the 319-acre parcel. The parents testified that this was a bargain price; that the land was worth twice as much. They agreed to sell at that price because they had helped Roger's sister financially and wanted to be fair to Roger. The contract called for annual installments of between $10,000 and $25,000, with 6 percent annual interest to apply on the balance. The

contract further provided that the parents had the option to declare a forfeiture if any of the terms were not met, all previous payments to be forfeited as liquidated damages. The contract was drawn in the office of the parents' attorney. At that time, Roger and Sandra were experiencing marital discord. The attorney explained that the contract was intended to exclude Sandra from getting any interest in the farm in the event of a divorce. Sandra testified that she understood this explanation and did not object to the arrangement.

Roger made a down payment of $20,000, employing borrowed funds. In April of 1977, when the first annual installment payment came due, Roger tendered $18,000 cash and a $5,000 note, due in December. Sandra filed a petition for dissolution of marriage on November 4, 1977. In December, when the note came due, Roger told his parents that he was unable to pay. He was granted a 30-day extension. On February 23, 1978, forfeiture papers were served on him. Neither Roger nor Sandra contested the forfeiture at that time. The court found that, on that date, Roger owed his parents $226,200 in unpaid principal and accrued interest. Judgment dissolving the marriage was entered on June 19, 1978. A hearing was held on the property issues and an opinion of the court was filed on November 1, 1979. Judgment was entered December 4, 1979. An opinion and order on post-trial motions was entered August 8, 1980.

The trial court found the Sackville Farm to be marital property (Ill. Rev. Stat. 1977, ch. 40, par. 503(a)), declaring that the transfer of rights from Roger to his parents under the forfeiture was "colorable." The court found that Roger had sufficient funds to pay off the $5,000 note. It based this finding upon Roger's ability to pay off debts on improvements to the Sackville farm and debts on farm machinery. Subsequent to the forfeiture, Roger continued to farm the land, paying his parents an annual cash rent of $25,000. The court concluded, "It is * * * apparent that Roger simply allowed the agreement to be terminated in order to return the property to his parents and thereby attempt to frustrate his wife's attempt to claim an interest in the property."

Although the only appraisal of the land in April of 1976, the date the installment sales contract was drawn, indicated that the land was then worth $1,335 per acre, the court found that the $750 per acre sale price was "fair," based upon the parents' own testimony. Accordingly, the court found that none of the property was a gift and thereby excepted from the definition of marital property. (Ill. Rev. Stat. 1977, ch. 40, par. 503(a)(1).) The court found the value of the Sackville Farm to be $656,000, or $2,056 per acre. Deducting the $226,000 it had found Roger to still owe on the property, the court declared Roger's equity in the land to be $430,000. This, the court found to be marital property. The court awarded Sandra 30% of the marital property. Thus, her interest in the Sackville Farm was

determined to be $120,000. Along with her share of other marital property, her total marital property award was $151,290. The court did not disturb the title to the Sackville Farm, which was held by Roger's parents. However, a lien for the amount of $151,290 was imposed upon the farm in favor of Sandra.

There is no doubt that a court of equity has the power to avoid a forfeiture when that forfeiture is a fraud upon the rights of a creditor or equitable lienor. The question is whether such a fraud occurred in this case. It is undisputed that the contract for deed was executed during the marriage of the parties. It is, therefore, clear that, had the husband continued to enjoy contract rights at the date of the marriage's dissolution, such contract rights would have been marital property, absent of any of the exceptions listed in section 503(a) of the Illinois Marriage and Dissolution of Marriage Act (Ill. Rev. Stat. 1977, ch. 40, par. 503(a), (b)). The contract rights would have been marital property even though the concept of marital property did not exist in this State on the date the husband acquired those rights. *Kujawinski v. Kujawinski* (1978), 71 Ill. 2d 563, 376 N.E.2d 1382.

It is equally clear, however, that the property would be nonmarital if it fell within one of the exceptions listed in section 503(a). Although there is some evidence that a portion of the property transferred to Roger by his parents was a gift, and therefore nonmarital (Ill. Rev. Stat. 1977, ch. 40, par. 503(a)(1)), we shall not disturb the trial court's finding that none of the initial acquisition was by way of gift. Property may also be excluded from the marital estate "by valid agreement of the parties." (Ill. Rev. Stat. 1977, ch. 40, par. 503(a)(4).) Sandra's oral agreement that she would take nothing by virtue of the transfer of contract rights in the farm to her husband obviously did not contemplate the new rights she would acquire under the Illinois Marriage and Dissolution of Marriage Act of 1977, which was not then in effect. Nevertheless, it is clear that a party's expectations may be defeated by the 1977 Act. Property which was considered separately owned by one of the parties prior to the Act, may by force of law, become marital property under the Act. (*Kujawinski v. Kujawinski* (1978), 71 Ill. 2d 563, 376 N.E.2d 1382.) Prior to the current Act, a spouse enjoyed "special equities", *i.e.*, "if it shall appear to the court that either party holds title to property equitably belonging to the other, the court may compel conveyance thereof to be made to the party entitled to the same upon such terms as it shall deem equitable." (Ill. Rev. Stat. 1975, ch. 40, par. 18.) It is unclear whether Sandra renounced those rights, which might have applied had she brought suit for divorce sooner. We need not reach the question of whether the oral agreement, to which Sandra admitted in court, amounts to a "valid agreement" to "exclude" the property from the marital estate. Her understanding of the legal

consequences of the conveyance is, however, relevant to the issue of whether she was defrauded.

It is to be noted that Sandra did not file a petition to enjoin the transfer of the contract rights in the Sackville Farm until April of 1978, after the forfeiture was an accomplished fact and five months after her petition for dissolution. This tardiness is consistent with her prior understanding that she had no interest in the property. The court found that Roger had sufficient funds to pay the $5,000, as evinced by his payment of debts on improvements to the farm. The court reasoned that the payment of those debts was unreasonable if, as a result, he was going to lose the very farm on which the improvements had been made. However, these were not the only debts that Roger had incurred. He owed a great deal of money to a variety of creditors. Therefore, he needed to maintain his reputation for creditworthiness. Moreover, his parents offered him a 30-day extension. That Roger preferred to default on his debt to his parents, rather than on debts to commercial creditors, does not necessarily indicate that his sole motivation was to defraud his wife out of her marital rights. Moreover, Roger's payment for the improvements to his property was not unreasonable. After losing his equity in the farm, Roger stayed on as a tenant. Thus, he still enjoyed the improvements for which he paid, while maintaining his creditworthiness among strangers.

That he was able to pay cash rent in 1979 does not necessarily indicate that he was able to pay the contract debt in 1977. Had he suffered the repossession of his improvements or his machinery, he might have postponed briefly his default, but thereby caused himself greater financial troubles than the default itself. No doubt, Roger and his parents were pleased by what they considered the elimination of Sandra's claim to the property. That alone, however, does not mean that the transfer by default was fraudulent, "colorable" or "illusory." There is no indication that Roger secretly maintained an equity interest in the property. (*Johnson v. La Grange State Bank* (1978), 73 Ill. 2d 342, 359-60, 383 N.E.2d 185.) Both before and after his short-lived status as an equity holder, he paid a fair rental price for the use of the land. In light of Roger's small equity interest in the property and the contract's restrictions upon alienation, the court's conclusion, that Roger could have readily alienated the property and enjoyed the full measure of the unrealized appreciation, is not clearly supported by the evidence.

■■■ The Illinois Marriage and Dissolution of Marriage Act did not create community property in this State. Until the marriage is dissolved, the titleholder is free to alienate his property, subject to the usual legal and equitable interests of his creditor. (*Kujawinski v. Kujawinski* (1978), 71 Ill. 2d 563, 573, 376 N.E.2d 1382), even if such a transfer serves to defeat the expectations of his spouse. (*Cf. Johnson v. La Grange State Bank* (1978),

73 Ill. 2d 342, 383 N.E.2d 185.) The trial court relied heavily upon the case of *Klingberg v. Klingberg* (1979), 68 Ill. App. 3d 513, 386 N.E.2d 517. We do not believe that the *Klingberg* case addresses itself to the principal issue here. Under *Klingberg*, marital property is to be divided taking into account, *inter alia*, each party's dissipation of marital and nonmarital property. Roger acknowledges that $27,000 of marital funds were spent in the improvement of the Sackville property and that his default on the installment contract resulted in the "dissipation" of those funds. The appropriate remedy, therefore, is the consideration of this "dissipation" in the division "in just proportions" of the marital property. (Ill. Rev. Stat. 1977, ch. 40, par. 503(c)(1).) Such dissipation, however, does not convert nonmarital property into marital property.

■■ Fraud must be proved by clear and convincing evidence. (*Ray v. Winter* (1977), 67 Ill. 2d 296, 303, 367 N.E.2d 678.) The evidence was not clear and convincing that Roger's loss, by default, of his contract rights to his parents constituted a fraud upon his wife. Sandra's previous renunciation of any interest in the Sackville Farm negates any presumption that Roger stood in a fiduciary relationship toward her as regards this property. Therefore, the court erred in avoiding the forfeiture. We understand the court's displeasure with Roger and his parents for effecting this forfeiture *pendente lite*, while the court had jurisdiction to determine the parties' marital rights. However, in the absence of fraud, the conveyance was valid. As neither of the parties had an interest in the property at the time the marriage was dissolved, it cannot be denominated marital property. *Kujawinski v. Kujawinski* (1978), 71 Ill. 2d 563, 573, 376 N.E.2d 1382.

The judgment of the court is, therefore, reversed and the cause remanded to the Circuit Court of Mercer County for further disposition consistent with this opinion. Because significant property rights have been affected by this judgment, all other property issues, including the apportionment of the marital property, maintenance and attorney's fees are open for re-argument and reconsideration.

Reversed and remanded.

BARRY, J., concurs.

Mr. JUSTICE STOUDER, dissenting:
I respectfully disagree with the result reached by my colleagues. I would affirm the judgment of the trial court in all respects.
My disagreement with the reasoning and result reached by the majority is not about any theory of law but on the application of a well-settled principle of law which the majority recognizes. This principle is

that the resolution of factual disputes is primarily the function of the trial court, and furthermore, where the decision of the trial court is supported by substantial evidence, the decision ought not be disturbed on review.

With respect to most of the factual findings of the trial court, my colleagues agree. These include the findings that the execution of the agreement for warranty deed did not constitute a gift, that the increase in value should be considered marital property, and that the wife had not waived and was entitled to have such property considered marital property in making an appropriate distribution of property incident to the dissolution of the marriage.

The only factual determination with which the majority disagree is the trial court's holding that the forfeiture of the contract was colorable. I believe this holding is supported by adequate evidence, and even the majority concedes the existence of such evidence but holds as a matter of law that the forfeiture was a good-faith arms-length transaction. I have no doubt that a contract seller may forfeit a contract in good faith and eliminate such property from consideration in the distribution of assets incident to a dissolution of marriage. However, that is not the question in this case.

The trial court held, and I believe the facts support the conclusion, that the forfeiture was not made in good faith, was colorable only, and in effect was designed to leave the husband in the same position as before the forfeiture free from any consideration favorable to the spouse. I am disappointed that the majority felt obliged to substitute its opinion for that of the trial court.